The CETACEAN COMMUNITY, Plaintiff-Appellant,

v.

George W. BUSH, President of the United States of America; Donald H. Rumsfeld, United States of America Secretary of Defense, Defendants-Appellees.

No. 03-15866.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 12, 2004.

Filed Oct. 20, 2004.

Lanny Sinkin (argued), Hilo, Hawaii, for the appellant.

Ann D. Navaro, Kristen L. Gustafson, Kathryn E. Kovacs (argued), United States Department of Justice, Environmental and Natural Resources Division, Washington, D.C., for the appellees.

Before: HUG, ALARCÓN, and W. FLETCHER, Circuit Judges.

WILLIAM A. FLETCHER, Circuit Judge:

We are asked to decide whether the world's cetaceans have standing to bring suit in their own name under the Endangered Species Act, the Marine Mammal Protection Act, the National Environmental Protection Act, and the Administrative Procedure Act. We hold that cetaceans do not have standing under these statutes.

## I. Background

The sole plaintiff in this case is the Cetacean Community ("Cetaceans"). The Cetacean Community is the name chosen by the Cetaceans' self-appointed attorney for all of the world's whales, porpoises, and dolphins. The Cetaceans challenge the United States Navy's use of Surveillance Towed Array Sensor System Low Frequency Active Sonar ("SURTASS LFAS") during wartime or heightened threat conditions. The Cetaceans allege that the Navy has violated, or will violate, the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531–1544, the Marine Mammal Protection Act ("MMPA"), 16 U.S.C. §§ 1371–1421h, and the National Environmental

Policy Act ("NEPA"), 16 U.S.C. §§ 4321–4347.

The Navy has developed SURTASS LFAS to assist in detecting quiet submarines at long range. This sonar has both active and passive components. The active component consists of low frequency underwater transmitters. These transmitters emit loud sonar pulses, or "pings," that can travel hundreds of miles through the water. The passive listening component consists of hydrophones that detect pings returning as echoes. *See* 67 Fed. Reg. 46,712–16 (explaining SURTASS LFAS in more detail); 67 Fed.Reg. 48,-145–48 (same). Through their attorney, the Cetaceans contend that SURTASS LFAS harms them by causing tissue damage and other serious injuries, and by disrupting biologically important behaviors including feeding and mating.

The negative effects of underwater noise on marine life are well recognized. An analysis accompanying the current regulations for the Navy's use of SURTASS LFAS summarizes the harmful effects as follows:

> [A]ny human-made noise that is strong enough to be heard has the potential to reduce (mask) the ability of marine mammals to hear natural sounds at similar frequencies, including calls from conspecifics, echolocation sounds of ondontocetes, and environmental sounds such as surf noise.... [V]ery strong sounds have the potential to cause temporary or permanent reduction in hearing sensitivity. In addition, intense acoustic or explosive events may cause trauma to tissues associated with organs vital for hearing, sound production, respiration, and other functions. This trauma may include minor to severe hemorrhage.

67 Fed.Reg. 46,778; *see also Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 737 n. 4 (9th Cir.2001) (noting that the "acoustic environment appears to be very important to humpback whales"). The current regulations, governing routine peacetime training and testing, have been challenged in a separate action. *Natural Res. Def. Council, Inc. v. Evans*, 279 F.Supp.2d 1129, 1191 (N.D.Cal.2003) ("NRDC") (issuing permanent injunction restricting the Navy's routine peacetime use of LFA sonar "in areas that are particularly rich in marine life").

The Cetaceans do not challenge the current regulations. Instead, they seek to compel President Bush and Secretary of Defense Rumsfeld to undertake regulatory review of use of SURTASS LFAS during threat and wartime conditions. The Navy has specifically excepted such use of SURTASS LFAS from the current regulations. *See* Fed.Reg. 46,717; 67 Fed.Reg. 48,146. The Cetaceans seek an injunction ordering the President and the Secretary of Defense to consult with the National Marine Fisheries Service under the ESA, 16 U.S.C. § 1536(a), to apply for a letter of authorization under the MMPA, 16 U.S.C. § 1371(a)(2), and to prepare an environmental impact statement under NEPA, 42 U.S.C. § 4332(2)(C). They also seek an injunction banning use of SURTASS LFAS until the President and the Secretary of Defense comply with what the Cetaceans contend these statutes command.

Defendants moved to dismiss the Cetaceans' suit under Federal Rules of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction and 12(b)(6) for failure to state a claim upon which relief can be granted. Without specifying which of these rules was the basis for its decision, the district court granted the motion to dismiss. The court held, *inter alia,* that the Cetaceans lacked standing under the ESA, the MMPA, NEPA and the Administrative Procedure Act ("APA"). *Cetacean*

*Community v. Bush,* 249 F.Supp.2d 1206 (D.Haw.2003).

■ The Cetaceans timely appeal. We review the district court's standing decision de novo. *City of Sausalito v. O'Neill,* 386 F.3d 1186, 2004 WL 2348385 (filed October 20, 2004); *Bernhardt v. County of Los Angeles,* 279 F.3d 862, 867 (9th Cir. 2002). We agree with the district court that the Cetaceans have not been granted standing to sue by the ESA, the MMPA, NEPA, or the APA. We therefore conclude that dismissal under Rule 12(b)(6) for failure to state a claim was correct, and we affirm the district court.

## II. Our Decision in *Palila IV*

The Cetaceans contend that an earlier decision of this court requires us to hold that they have standing under the ESA. We first address that decision. In *Palila v. Hawaii Department of Land and Natural Resources,* 852 F.2d 1106, 1107 (9th Cir.1988) (*"Palila IV"*), a suit to enforce the ESA, we wrote that an endangered member of the honeycreeper family, the Hawaiian Palila bird, "has legal status and wings its way into federal court as a plaintiff in its own right." *Id.* We wrote, further, that the Palila had "earned the right to be capitalized since it is a party to these proceedings." *Id.*

If these statements in *Palila IV* constitute a holding that an endangered species has standing to sue to enforce the ESA, they are binding on us in this proceeding. *Brand X Internet Services v. FCC,* 345 F.3d 1120, 1130 (9th Cir.2003) ("three-judge panels are bound by the holdings of earlier three-judge panels"). The government argues that these statements in *Palila IV* are nonbinding dicta. *See, e.g., Hawaiian Crow ('Alala) v. Lujan,* 906 F.Supp. 549, 552 n. 2 (D.Haw.1991) (characterizing statements in *Palila IV* as nonbinding dicta); *Citizens to End Animal Suffering & Exploitation, Inc. v. New England Aquarium,* 836 F.Supp. 45, 49 (D.Mass.1993) (same). The district court agreed with the government's argument. *Cetacean Community,* 249 F.Supp.2d at 1210 ("As other courts have recognized, however, this statement is dicta and does not constitute precedent binding on this court."). However, at least two district courts, relying on our statements in *Palila IV,* have held that the ESA grants standing to animals. *Marbled Murrelet v. Pac. Lumber Co.,* 880 F.Supp. 1343, 1346 (N.D.Cal.1995); *Loggerhead Turtle v. County Council of Volusia, Florida,* 896 F.Supp. 1170, 1177 (M.D.Fla.1995) (citing *Marbled Murrelet*). We asked for briefing on whether we should take this case en banc to overrule *Palila IV.* A majority of the nonrecused judges voted not to take this case en banc.

■ After due consideration, we agree with the district court that *Palila IV's* statements are nonbinding dicta. A statement is dictum when it is " 'made during the course of delivering a judicial opinion, but ... is unnecessary to the decision in the case and [is] therefore not precedential.' " *Best Life Assur. Co. v. Comm'r,* 281 F.3d 828, 834 (9th Cir.2002) (quoting *Black's Law Dictionary* 1100 (7th ed.1999)). The line is not always easy to draw, however, for "where a panel confronts an issue germane to the eventual resolution of the case, and resolves it after reasoned consideration in a published opinion, that ruling becomes the law of the circuit, regardless of whether doing so is necessary in some strict logical sense." *United States v. Johnson,* 256 F.3d 895, 914 (9th Cir.2001) (Kozinski, J., concurring).

When we decided *Palila IV,* the case had already been the subject of three published opinions, two by the district court and one by this court. Standing for most

of the plaintiffs had always been clear, and standing for the Palila had never been a disputed issue. In *Palila I,* the district court noted that the action "was filed in the name of the Palila by the Sierra Club, National Audubon Society, Hawaii Audubon Society, and Alan C. Ziegler, suing as next friends and on their own behalf, as plaintiffs." *Palila v. Hawaii Dep't of Land & Natural Res.* ("*Palila I* "), 471 F.Supp. 985, 987 (D.Haw.1979). On appeal from that decision, we wrote in *Palila II,* "The Sierra Club and others brought this action in the name of the Palila." *Palila v. Hawaii Dep't of Land & Natural Res.* ("*Palila II* "), 639 F.2d 495, 496 (9th Cir. 1981). On remand, the district court did not repeat its description of the plaintiffs, but the parties were unchanged. *Palila v. Hawaii Dep't of Land & Natural Res.* ("*Palila III* "), 649 F.Supp. 1070 (D.Haw. 1986). Finally, in *Palila IV,* immediately after we stated that the Palila "wings it way into the federal court as a plaintiff in its own right," we noted that "the Sierra Club and others brought an action under the [ESA] on behalf of the Palila." *Palila IV,* 852 F.3d at 1107.

■ We have jurisdiction if at least one named plaintiff has standing to sue, even if another named plaintiff in the suit does not. *See Laub v. U.S. Dep't. of Interior,* 342 F.3d 1080, 1086 (9th Cir.2003). Because the standing of most of the other parties was undisputed in *Palila I–IV,* no jurisdictional concerns obliged us to consider whether the Palila had standing. *Cf. Hawksbill Sea Turtle v. FEMA,* 126 F.3d 461, 466 n. 2 (3d Cir.1997) (allowing turtle to remain named in case caption, but not deciding whether it had standing because named human parties did). Moreover, we were never asked to decide whether the Palila had standing.

In context, our statements in *Palila IV* were little more than rhetorical flourishes.

They were certainly not intended to be a statement of law, binding on future panels, that animals have standing to bring suit in their own name under the ESA. Because we did not hold in *Palila IV* that animals have standing to sue in their own names under the ESA, we address that question as a matter of first impression here.

## III. Standing

■ Standing involves two distinct inquiries. First, an Article III federal court must ask whether a plaintiff has suffered sufficient injury to satisfy the "case or controversy" requirement of Article III. To satisfy Article III, a plaintiff "must show that (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Sys. (TOC), Inc.,* 528 U.S. 167, 180–81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). If a plaintiff lacks Article III standing, Congress may not confer standing on that plaintiff by statute. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 576–77, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). A suit brought by a plaintiff without Article III standing is not a "case or controversy," and an Article III federal court therefore lacks subject matter jurisdiction over the suit. *Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 101, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). In that event, the suit should be dismissed under Rule 12(b)(1). *See Steel Co.* at 109–10, 118 S.Ct. 1003; *Warren v. Fox Family Worldwide, Inc.,* 328 F.3d 1136, 1140 (9th Cir. 2003); *Scott v. Pasadena Unified Sch. Dist.,* 306 F.3d 646, 664 (9th Cir.2002).

Second, if a plaintiff has suffered sufficient injury to satisfy Article III, a federal court must ask whether a statute has conferred "standing" on that plaintiff. Non-constitutional standing exists when "a particular plaintiff has been granted a right to sue by the specific statute under which he or she brings suit." *Sausalito,* 386 F.3d at 1199, 2004 WL 2348385. To ensure enforcement of statutorily created duties, Congress may confer standing as it sees fit on any plaintiff who satisfies Article III. *Id.* at 1199, 2004 WL 2348385. Where it is arguable whether a plaintiff has suffered sufficient injury to satisfy Article III, the Supreme Court has sometimes insisted as a matter of "prudence" that Congress make its intention clear before it will construe a statute to confer standing on a particular plaintiff. *See, e.g., Nat'l Credit Union Admin. v. First Nat. Bank & Trust Co.,* 522 U.S. 479, 488, 118 S.Ct. 927, 140 L.Ed.2d 1 (1998); *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); *see also Fed. Election Com'n v. Akins,* 524 U.S. 11, 19, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998) (describing "the common-law interests and substantive statutory rights upon which 'prudential' standing traditionally rested"); *Raines v. Byrd,* 521 U.S. 811, 820 n. 3, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997) (explicit grant of authority to bring suit "eliminates any prudential standing limitations"). If a plaintiff has suffered sufficient injury to satisfy the jurisdictional requirement of Article III but Congress has not granted statutory standing, that plaintiff cannot state a claim upon which relief can be granted. *See Steel Co.,* 523 U.S. at 97, 118 S.Ct. 1003 (statutory standing is not a jurisdictional question of whether there is case or controversy under Article III); *Guerrero v. Gates,* 357 F.3d 911, 920–21 (9th Cir. 2003) (where plaintiffs lacked standing under RICO, affirming district court's dis-missal under Federal Rule of Civil Procedure 12(b)(6)). In that event, the suit should be dismissed under Rule 12(b)(6). *Guerrero,* 357 F.3d at 920–21.

### A. Article III Standing

Article III does not compel the conclusion that a statutorily authorized suit in the name of an animal is not a "case or controversy." As commentators have observed, nothing in the text of Article III explicitly limits the ability to bring a claim in federal court to humans. *See* U.S. Const. art. III; *see also* Cass R. Sunstein, *Standing for Animals (With Notes on Animal Rights )*, 47 UCLA L.Rev. 1333 (2000) (arguing that Congress could grant standing to animals, but has not); Katherine A. Burke, *Can We Stand For It? Amending the Endangered Species Act with an Animal–Suit Provision,* 75 U. Colo. L.Rev. 633 (2004) (same).

Animals have many legal rights, protected under both federal and state laws. In some instances, criminal statutes punish those who violate statutory duties that protect animals. *See, e.g.,* African Elephant Conservation Act, 16 U.S.C. §§ 4201–4245; Animal Welfare Act, 7 U.S.C. §§ 2131–2159; Horse Protection Act, 15 U.S.C. §§ 1821–1831; Wild Free–Roaming Horses and Burros Act, 16 U.S.C. §§ 1331–1340; *see also, e.g.,* N.Y. Agric. & Mkts. Law § 356 (obliging anyone who has impounded or confined an animal to provide good air, water, shelter, and food); Cal.Penal Code § 597a (imposing criminal penalties on anyone who transports an animal in a cruel or inhumane manner). In other instances, humans whose interests are affected by the existence or welfare of animals are granted standing to bring civil suits to enforce statutory duties that protect these animals. The ESA and the MMPA are good examples of such statutes.

 It is obvious that an animal cannot function as a plaintiff in the same manner as a juridically competent human being. But we see no reason why Article III prevents Congress from authorizing a suit in the name of an animal, any more than it prevents suits brought in the name of artificial persons such as corporations, partnerships or trusts, and even ships, or of juridically incompetent persons such as infants, juveniles, and mental incompetents. *See, e.g., Sausalito,* 386 F.3d at 1202, 2004 WL 2348385 (city is a "person" that can bring suit under the APA); *Walker v. City of Lakewood,* 272 F.3d 1114, 1123 n. 1 (9th Cir.2001) (non-profit corporation had standing to sue under FHA and FEHA); *The Gylfe v. The Trujillo,* 209 F.2d 386 (2d Cir.1954) (discussing counterclaim by ship as "injured party" in collision litigation); *Cruzan by Cruzan v. Director, Missouri Dept. of Health,* 497 U.S. 261, 266, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990) (plaintiff Nancy Cruzan was in "persistent vegetative state"); *see also* Christopher D. Stone, *Should Trees Have Standing?-Toward Legal Rights for Natural Objects,* 45 S. Cal. L.Rev. 450, 452 & n.13 (1972) ("The world of the lawyer is peopled with inanimate rights holders: trusts, corporations, joint ventures, municipalities, Subchapter R partnerships, and nation-states, to mention just a few.").

If Article III does not prevent Congress from granting standing to an animal by statutorily authorizing a suit in its name, the question becomes whether Congress has passed a statute actually doing so. We therefore turn to whether Congress has granted standing to the Cetaceans under the ESA, the MMPA, NEPA, read either on their own, or through the gloss of Section 10(a) of the APA.

### B. Statutory Standing

#### 1. The APA

Section 10(a) of the APA provides:

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.

5 U.S.C. § 702. When a plaintiff seeks to challenge federal administrative action, Section 10(a) provides a mechanism to enforce the underlying substantive statute. Section 10(a) grants standing to any person "adversely affected or aggrieved by a relevant statute," making the relevant inquiry whether the plaintiff is hurt within the meaning of that underlying statute.

If a statute provides a plaintiff a right to sue, it is often said that the plaintiff has been granted a "private right of action." *See, e.g., Devereaux v. Abbey,* 263 F.3d 1070, 1074 (9th Cir.2001) (en banc) (explaining that 42 U.S.C. § 1983 creates a "private right of action against individuals who, acting under color of state law, violate federal constitutional or statutory rights."). The phrase "private right of action" is sometimes used in the context of administrative law to refer to a right to challenge administrative action that is explicitly and directly provided by a particular statute, in contrast to a right to challenge administrative action granted only when the statute is read with the gloss of Section 10(a) of the APA. *See, e.g., Lujan v. National Wildlife Federation,* 497 U.S. 871, 882, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). This manner of speaking is somewhat misleading when a plaintiff seeks to challenge an administrative action, for the end result is the same whether the underlying statute grants standing directly or whether the APA provides the gloss that grants standing. In both cases, the plaintiff can bring suit to challenge the administrative action in question. In the first case, the substantive statute grants statutory standing directly to the plaintiff. In

the second case, the substantive statute is enforced through Section 10(a) of the APA.

 In *Data Processing,* 397 U.S. at 153, 90 S.Ct. 827, the Supreme Court construed Section 10(a) to grant standing to all those "arguably within the zone of interests" protected by the substantive statute whose duties the plaintiff was seeking to enforce. Under the reading of "arguably within" provided by *Data Processing,* courts grant standing fairly generously under the APA. As the Supreme Court wrote in *Clarke v. Securities Industry Association,* 479 U.S. 388, 399, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987), the "zone of interests" test is "not meant to be especially demanding," and a court should deny standing only "if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *See Sausalito,* 386 F.3d at 1200, 2004 WL 2348385 (citation omitted); *Ocean Advocates v. U.S. Army Corps of Eng'rs,* 361 F.3d 1108, 1120–21 (9th Cir.2004).

### 2. The ESA

 The ESA contains an explicit provision granting standing to enforce the duties created by the statute. The ESA's citizen-suit provision states that "any person" may "commence a civil suit on his own behalf ... to enjoin any person, including the United States and any other governmental instrumentality or agency ... who is alleged to be in violation of any provision of this chapter or regulation...." 16 U.S.C. § 1540(g)(1)(A). The ESA contains an explicit definition of the "person" who is authorized to enforce the statute:

> The term "person" means an individual, corporation, partnership, trust, association, or an other private entity; or any officer, employee, agent, department, or

instrumentality of the Federal Government, or any State, municipality, or political subdivision of a State, or of any foreign government; any State, municipality, or political subdivision of a State; or any other entity subject to the jurisdiction of the United States.

*Id.* § 1532(13).

The ESA also contains separate definitions of "species," "endangered species," "threatened species," and "fish and wildlife." A "species" is defined as follows:

> The term "species" includes any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature.

*Id.* § 1532(16). "Fish or wildlife" are defined as follows:

> The term "fish or wildlife" means any member of the animal kingdom, including without limitation any mammal, fish, bird ... amphibian, reptile, mollusk, crustacean, arthropod or other invertebrate....

*Id.* § 1532(8). An "endangered species" is defined as follows:

> The term "endangered species" means any species which is in danger of extinction throughout all or a significant portion of its range other than [certain dangerous species of insects].

*Id.* § 1532(6). Finally, a "threatened species" is defined as follows:

> The term "threatened species": means any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range.

*Id.* § 1532(20).

It is obvious both from the scheme of the statute, as well as from the statute's explicit definitions of its terms, that animals are the protected rather than the

protectors. The scheme of the ESA is that a "person," as defined in § 1532(13), may sue in federal district court to enforce the duties the statute prescribes. Those duties protect animals who are "endangered" or "threatened" under § 1532(6) and (20). The statute is set up to authorize "persons" to sue to protect animals whenever those animals are "endangered" or "threatened." Animals are not authorized to sue in their own names to protect themselves. There is no hint in the definition of "person" in § 1532(13) that the "person" authorized to bring suit to protect an endangered or threatened species can be an animal that is itself endangered or threatened.

We get the same answer if we read the ESA through Section 10(a) of the APA. The Supreme Court has specifically instructed us that standing under the ESA is broader than under the APA's "zone of interests" test. *Bennett v. Spear*, 520 U.S. 154, 163–64, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). Moreover, like the ESA, Section 10(a) of the APA grants standing to a "person." "Person" is explicitly defined to include "an individual, partnership, corporation, association, or public or private organization other than an agency." 5 U.S.C. §§ 551(2), 701(b)(2). Notably absent from that definition is "animal." *Data Processing*, 397 U.S. at 156, 90 S.Ct. 827, and *Clarke*, 479 U.S. at 400 n. 16, 107 S.Ct. 750, instruct us that Section 10(a) means that we should read the underlying statute to grant standing generously, such that "persons" who are "adversely affected or aggrieved" are all persons "arguably within the zone of interests" protected by the underlying statute. *See Bennett*, 520 U.S. at 163, 117 S.Ct. 1154. But, as with the ESA, these cases do not instruct us to expand the basic definition of "person" beyond the definition provided in the APA.

### 3. The MMPA

Unlike the ESA, the MMPA contains no explicit provision granting standing to enforce its duties. The MMPA imposes a moratorium on "taking" a marine mammal without a permit, and prohibits "incidental, but not intentional" takes without a letter of authorization. 16 U.S.C. § 1371(a)(51)(1). The statute defines "[to] take" as "[to] harass, hunt, capture, or kill" any marine mammal, or to attempt to do any of these things. *Id.* § 1362(13). The MMPA explicitly grants standing to seek judicial review to any permit applicant, and to a "party" opposed to such a permit. *Id.* § 1374(d)(6). But the statute says nothing about the standing of a would-be party, such as the Cetaceans, who seek to compel someone to apply for a letter of authorization, or for a permit.

Relying on Section 10(a) of the APA, as well as *Data Processing* and *Clarke*, we have held that affected "persons" with conservationist, aesthetic, recreational, or economic interests in the protection of marine mammals have standing to seek to compel someone to apply for a permit under the MMPA. *Sausalito*, 386 F.3d at 1203, 2004 WL 2348385 (citing 5 U.S.C. § 702; *Clarke*, 479 U.S. at 399, 107 S.Ct. 750). But, as discussed above, Section 10(a) of the APA does not define "person" to include animals. No court has ever held that an animal-even a marine mammal whose protection is at stake-has standing to sue in its own name to require that a party seek a permit or letter of authorization under the MMPA. *See Citizens to End Animal Suffering & Exploitation, Inc.*, 836 F.Supp. at 49 (rejecting such a suit). Absent a clear direction from Congress in either the MMPA or the APA, we hold that animals do not have standing to enforce the permit requirement of the MMPA.

### 4. NEPA

NEPA requires that an environmental impact statement ("EIS") be prepared for "major Federal actions significantly affecting the quality of the human environment...." 42 U.S.C. § 4332(2)(C). As is true of the MMPA, no provision of NEPA explicitly grants any person or entity standing to enforce the statute, but judicial enforcement of NEPA rights is available through the APA. *Lujan,* 497 U.S. at 882, 110 S.Ct. 3177. Interpreting NEPA broadly, we have recognized standing for individuals and groups of individuals who sue to require preparation of an EIS, when they contend that a challenged federal action will adversely affect the environment. *See, e.g., Ocean Advocates,* 361 F.3d at 1121; *Laub v. U.S. Dept. of Interior,* 342 F.3d 1080, 1086 (9th Cir.2003); *Citizens for Better Forestry v. U.S. Dept. of Agriculture,* 341 F.3d 961, 976 (9th Cir.2003). However, we see nothing in either NEPA or the APA that would permit us to hold that animals who are part of the environment have standing to bring suit on their own behalf.

### 5. Associational Standing

The Cetaceans argue that even if individual cetaceans do not have standing, their group has standing as an "association" under the APA, 5 U.S.C. § 551(2) (defining "person" to include an "association"). We disagree. A generic requirement for associational standing is that an association's "members would otherwise have standing to sue in their own right." *Laidlaw,* 528 U.S. at 181, 120 S.Ct. 693. As discussed above, individual animals do not have standing to sue under the ESA, the MMPA, NEPA and the APA. Nor can the Cetaceans establish first-party organizational standing as an association under the APA. *See Havens Realty Corp. v. Coleman,* 455 U.S. 363, 378–79, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982) (association had standing as "person" in its own right under the Fair Housing Act); *Warth v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (recognizing that an organization may sue on its own behalf for injuries it has sustained); *Fair Housing of Marin v. Combs,* 285 F.3d 899, 904 (9th Cir.2002), *cert. denied,* 537 U.S. 1018, 123 S.Ct. 536, 154 L.Ed.2d 425 (2002) (following *Havens* ). The complaint presents no evidence that the Cetaceans comprise a formal association, nor can we read into the term "association" in the APA a desire by Congress to confer standing on a non-human species as a group, any more than we can read into the term "person" Congressional intent to confer standing on individual animals. *See Black's Law Dictionary* 132 (8th ed.2004) (defining "association" as "[a] gathering of people for a common purpose; the persons so joined").

### Conclusion

We agree with the district court in *Citizens to End Animal Suffering & Exploitation, Inc.,* that "[i]f Congress and the President intended to take the extraordinary step of authorizing animals as well as people and legal entities to sue, they could, and should, have said so plainly." 836 F.Supp. at 49. In the absence of any such statement in the ESA, the MMPA, or NEPA, or the APA, we conclude that the Cetaceans do not have statutory standing to sue.

**AFFIRMED.**