**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| JIM ROUTE,<br><br>*Petitioner*,<br><br>v.<br><br>MERRICK B. GARLAND, Attorney General,<br><br>*Respondent*. | No. 19-72854<br><br>Agency No.<br>A215-927-145<br><br><br>OPINION |

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted April 13, 2021
Pasadena, California

Filed May 6, 2021

Before:  MILAN D. SMITH, JR. and SANDRA S. IKUTA,
Circuit Judges, and KATHRYN H. VRATIL,[*]
District Judge.

Opinion by Judge Milan D. Smith, Jr.

---

[*] The Honorable Kathryn H. Vratil, United States District Judge for the District of Kansas, sitting by designation.

**SUMMARY**[**]

**Immigration**

Denying Jim Route's petition for review of a decision of the Board of Immigration Appeals concluding that he was removable for having been convicted of a crime of moral turpitude (CIMT) within five years after the date of admission, 8 U.S.C. § 1227(a)(2)(A)(i), the panel deferred to the BIA's interpretation of the phrase "date of admission" as referring to the date of the admission by virtue of which the individual was present when he or she committed the relevant crime.

Route, a citizen of the Federated States of Micronesia (FSM), was admitted to the United States in 2005 and again in 2015. In 2018, he was convicted of unlawful imprisonment in the first degree, in violation of Hawai'i law. Under 8 U.S.C. § 1227(a)(2)(A)(i), an individual is removable if he or she is convicted of a CIMT within five years after the "date of admission," and is convicted of a crime for which a sentence of one year or longer may be imposed. The BIA concluded that Route's offense constituted a qualifying CIMT, and that it rendered him removable because he was convicted within five years of his 2015 admission. The BIA relied on its published decision in *Matter of Alyazji*, 25 I. & N. Dec. 397 (BIA 2011), in which it held that "date of admission," in the context of § 1227(a)(2)(A)(i), refers to the "date of the admission by

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

virtue of which the alien was present in the United States when he committed his crime."

Although the BIA's decision in Route's case was unpublished, the panel concluded that it was eligible for deference pursuant to *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc*., 467 U.S. 837 (1984), because it was directly controlled by a published decision, namely *Alyazji*.  At step one of *Chevron*, the panel concluded the phrase "date of admission" is ambiguous, explaining that the statute makes no attempt to distinguish which admission is the relevant one when there are multiple admissions.  At step two of *Chevron*, the panel held that the BIA's interpretation in *Alyazji* was reasonable, noting that the BIA: 1) employed traditional tools of statutory interpretation; 2) considered alternative interpretations; 3) rejected the interpretation that would focus on the first admission as not reconcilable with the language and purpose of the statute; and 4) considered changes to the statutory language, its own precedent, and precedent of the Courts of Appeals.

Route argued that the *Alyazji* interpretation did not comport with the Compact of Free Association governing the relationship between the United States and the FSM.  Pursuant to the Compact, a Micronesian citizen may be admitted to the United States and engage in occupations and establish residence as a nonimmigrant without visa approval or labor certification.  The panel rejected Route's contention, explaining that the text of the Compact clearly subjects Micronesian citizens to the removability grounds of § 1227(a).

**COUNSEL**

Michaela Posner (argued) and Patrick Randell (argued), Certified Law Students; Jennifer Lee Koh (argued), Supervising Attorney; University of California, Irvine, School of Law, Irvine, California; Peter Afrasiabi, One LLP, Newport Beach, California; for Petitioner.

Sara J. Bayram (argued), Trial Attorney; Aimee J. Carmichael, Senior Litigation Counsel; John W. Blakeley, Assistant Director; Brian M. Boynton, Acting Assistant Attorney General; Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C.; for Respondent.

**OPINION**

M. SMITH, Circuit Judge:

Jim Route, a citizen of the Federated States of Micronesia (FSM), was admitted to the United States twice: once in 2005, and again in 2015. In 2018, Route was convicted of unlawful imprisonment in the first degree, in violation of Hawai'i law. Subsequently, an immigration judge (IJ) ordered Route removed for having been "convicted of a crime involving moral turpitude committed within five years . . . after the date of admission." 8 U.S.C. § 1227(a)(2)(A)(i)(I). The IJ relied on Route's 2015 entry as the relevant admission for the purposes of § 1227(a)(2)(A)(i)(I). In an unpublished decision, the BIA affirmed the IJ's ruling. The BIA held that the 2015 admission constituted the relevant admission for the purposes of the statute pursuant to the reasoning in its previous published decision, *Matter of Alyazji*, 25 I. & N.

Dec. 397 (BIA 2011). Route petitions for review of the BIA's decision and argues that his 2005 admission should govern application of § 1227(a)(2)(A)(i)(I).

Although the BIA's decision in this case is unpublished, it is "directly controlled by a published decision," namely *Alyazji*. *Uppal v. Holder*, 605 F.3d 712, 714 (9th Cir. 2010). Thus, the BIA's decision is eligible for deference pursuant to *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *See Uppal*, 605 F.3d at 714. Turning to the two-step *Chevron* inquiry, we conclude that: (1) the phrase "the date of admission" in § 1227(a)(2)(A)(i)(I) is ambiguous; and (2) *Alyazji*'s interpretation of that ambiguous phrase is "a permissible construction of the statute," *Chevron*, 467 U.S. at 843. Therefore, we defer to the BIA's interpretation and deny the petition for review.

## I. Factual and Procedural Background

The relationship between the United States and the Federated States of Micronesia is governed by a Compact of Free Association. *See* Compact of Free Association Amendments Act of 2003 (US-FSM COFA), Pub. L. No. 108-188, 117 Stat. 2720.[1] Pursuant to the US-FSM COFA, a Micronesian citizen "may be admitted to, lawfully engage in occupations, and establish residence as a nonimmigrant in the United States . . . without regard to . . . 8 U.S.C. [§] 1182(a)(5) or (7)(B)(i)(II)," which contain requirements for labor certifications and visas. US-FSM COFA § 141(a).

---

[1] The US-FSM COFA is not part of the United States Code, but the text of the agreement can be found here: https://www.congress.gov/108/plaws/publ188/PLAW-108publ188.pdf.

Taking advantage of his rights pursuant to the US-FSM COFA, Route, who was born in Micronesia, entered the United States in November 2005 as a nonimmigrant. Route lived and worked in Hawai'i. In 2015, Route returned to Micronesia for a vacation with his children; they stayed for less than two months. In June 2015, Route returned to the United States and was again admitted as a nonimmigrant. In June 2018, Route was convicted of unlawful imprisonment in the first degree, a class C felony, in violation of Hawaii Revised Statutes § 707-721(1). Route was sentenced to 68 days' imprisonment and four years' probation.

In 2019, the Department of Homeland Security (DHS) charged that Route was removable pursuant to 8 U.S.C. § 1227(a)(2)(A)(i), which provides:

> Any alien who—
>
>> (I) is convicted of a crime involving moral turpitude committed within five years . . . after the date of admission, and
>>
>> (II) is convicted of a crime for which a sentence of one year or longer may be imposed,
>
> is deportable.

At a hearing before the IJ, Route conceded that he was admitted to the United States in 2015 and that he was convicted of unlawful imprisonment in 2018. DHS also alleged that a sentence of one year or more can be imposed for a violation of § 707-721(1), which Route did not contest. *See* Hawaii Revised Statutes § 706-660(1)(b) (providing that

the "maximum length of imprisonment" for a class C felony is "five years").

The IJ held that unlawful imprisonment in the first degree is a crime involving moral turpitude (CIMT). With little explanation, the IJ also noted that Route's 2015 entry was the relevant date of admission for the purposes of § 1227(a)(2)(A)(i)(I). Because Route was not eligible for any form of relief, the IJ ordered Route removed.

The BIA affirmed in an unpublished decision. The BIA agreed that unlawful imprisonment in the first degree constitutes a CIMT.[2] With regard to the date of admission, the BIA, quoting *Alyazji*, 25 I. & N. Dec. at 406, noted that it had "held that in the context of [§ 1227(a)(2)(A)(i)], 'the phrase "the date of admission" refers to the date of the admission by virtue of which the alien was present in the United States when he committed his crime.'" Thus, according to the BIA, "[a]lthough [Route] may have been lawfully admitted in 2005, he was also lawfully admitted on June 8, 2015, which was less than 5 years prior to the commission of his CIMT." The BIA dismissed the appeal and ordered Route removed.

## II. Matter of Alyazji

Before *Matter of Alyazji*, the BIA interpreted the phrase "the date of admission" from § 1227(a)(2)(A)(i)(I) in *In re Shanu*, 23 I. & N. Dec. 754 (BIA 2005). In that decision, the BIA "conclude[d] that the term 'date of admission' in

---

[2] A few weeks after the BIA rendered its decision in Route's case, we held in an unrelated case that unlawful imprisonment in the first degree, as defined by Hawaiʻi law, is a CIMT. *See Fugow v. Barr*, 943 F.3d 456 (9th Cir. 2019) (per curiam). Route does not challenge this aspect of the BIA's ruling.

[§ 1227(a)(2)(A)(i)] refers to, among other things, the date on which an alien is lawfully admitted for permanent residence by means of adjustment of status." *Id.* at 757. In other words, according to the rule set forth in *Shanu*, when an individual adjusted his or her status to be a lawful permanent resident (LPR), but did not physically leave and reenter the country, that adjustment of status was an "admission" and would reset the five-year clock for the purposes of § 1227(a)(2)(A)(i)(I).

A number of circuit courts criticized this interpretation of § 1227(a)(2)(A)(i)(I). *See Alyazji*, 25 I. & N. Dec. at 402. We were among them. *See Shivaraman v. Ashcroft*, 360 F.3d 1142 (9th Cir. 2004). In *Alyazji*, the BIA reconsidered its decision in *Shanu*, believing that the *Shanu* decision "paid insufficient attention" to the fact that in 1990 Congress substituted the term "after entry" with "within five years after *the* date of entry." *Alyazji*, 25 I. & N. Dec. at 405.

Starting from scratch in its interpretation of § 1227(a)(2)(A)(i)(I), the BIA applied the two-step approach from *Chevron*. First, the BIA noted that "[w]hen an alien with a single [CIMT] conviction has multiple 'admissions,' this language begs the question of which 'date of admission' should be viewed as having started the 5-year clock." *Id.* at 400. Thus, the BIA held that because "[t]he statutory language does not specify which of an alien's various admissions should be considered, . . . the statute [is] ambiguous in that regard." *Id.* at 405.

Next, the BIA attempted to "arrive at a reasonable construction of the statute, taking into account the language and structure of the [INA] as a whole." *Id.* The BIA rejected DHS's proposed rule of using a case-by-case approach, as the BIA believed that such an interpretation "would

introduce unpredictability and incoherence to the law." *Id.* at 404.

Instead, the BIA adopted the following rule:

> Given that [§ 1227(a)] is focused on admission plus presence, we find that the most natural reading of [§ 1227(a)(2)(A)(i)] is that the phrase "the date of admission" refers to the date of the admission by virtue of which the alien was present in the United States when he committed his crime.
>
> Thus, to ascertain an alien's deportability under [§ 1227(a)(2)(A)(i)] of the [INA], we look first to the date when his crime was committed. If, on that date, the alien was in the United States pursuant to an admission that occurred within the prior 5-year period, then he is deportable. Conversely, the alien is not deportable if he committed his offense more than 5 years after the date of the admission pursuant to which he was then in the United States. Moreover, under this understanding of the phrase "the date of admission," the 5-year clock is not reset by a new admission *from within* the United States (through adjustment of status). Rather, such a new admission merely extends an existing period of presence that was sufficient in and of itself to support the alien's susceptibility to the grounds of deportability.

*Id.* at 406–07 (footnotes omitted) (emphasis in original).

Alla Adel Alyazji had been admitted to the United States as a nonimmigrant in August 2001. *Id.* at 398. Alyazji never left the United States, and in 2006 he adjusted his status to LPR. *Id.* In 2008, he was convicted of a CIMT. *Id.* The BIA applied its new interpretation of § 1227(a)(2)(A)(i)(I) to Alyazji and held that although he was technically "'readmitted' by means of adjustment of status in April 2006," that adjustment of status "did not reset the 5-year clock because it added nothing to the deportability inquiry." *Id.* at 408.

Finally, the BIA applied its new rule to a hypothetical situation that did not involve an adjustment of status, but instead included two admissions by physical entry to the United States. The BIA described the case of "an alien who was admitted to the United States as a nonimmigrant tourist in 1990 on a family trip with his parents, and who returned to his home country a few weeks later in compliance with the terms of his temporary visa." *Id.* at 407. Then, "in the summer of 1998, the same alien was once again admitted to the United States, this time as a nonimmigrant college student." *Id.* at 407–08. If that hypothetical individual subsequently committed a CIMT in 2002, "[u]nder the [*Alyazji*] interpretation of [§ 1227(a)(2)(A)(i)(I)], the alien is deportable because, on the date when he committed his offense in 2002, he was in the United States pursuant to his admission as a nonimmigrant student in 1998, less than 5 years earlier." *Id.* at 408. In contrast, the 1990 "'date of admission' is irrelevant because the alien was not in the United States pursuant to that first admission when he committed his crime." *Id.*

## III. *Mead*

"[W]e review *de novo* the BIA's determination of questions of law, except to the extent that deference is owed

to its interpretation of the governing statutes and regulations." *Garcia-Quintero v. Gonzales*, 455 F.3d 1006, 1011 (9th Cir. 2006), *overruled on other grounds by Medina-Nunez v. Lynch*, 788 F.3d 1103 (9th Cir. 2015) (per curiam). We only owe *Chevron* deference, however, "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001).

The BIA's "interpretations of the INA made in the course of adjudicating cases before it satisfy the first requirement for *Chevron* deference set forth in *Mead*." *Marmolejo-Campos v. Holder*, 558 F.3d 903, 909 (9th Cir. 2009) (en banc). However, "[w]hether the [BIA's] interpretations of the INA satisfy *Mead*'s second requirement depends on the form the [BIA's] decision takes." *Id.* "[W]e have held that the [BIA's] precedential orders, which bind third parties, qualify for *Chevron* deference because they are made with a 'lawmaking pretense.' We have not accorded *Chevron* deference to the [BIA's] unpublished decisions, however, because they do not bind future parties." *Id.* (citation omitted); *see also Ceron v. Holder*, 747 F.3d 773, 785 (9th Cir. 2014) (en banc) ("We reiterate that our level of deference will depend on whether the BIA publishes its decision."). When the BIA does not publish its decision, we accord it deference pursuant to *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), which "entitl[es] the interpretation 'to a respect proportional to its power to persuade.'" *Choin v. Mukasey*, 537 F.3d 1116, 1120 (9th Cir. 2008) (quoting *Garcia-Quintero*, 455 F.3d at 1014).

There are limited circumstances in which the BIA's unpublished decisions are entitled to *Chevron* deference. Where the BIA has interpreted a term in the INA in a precedential decision, "we apply *Chevron* deference regardless of whether the order under review is the precedential decision itself or a subsequent unpublished order that relies upon it." *Marmolejo-Campos*, 558 F.3d at 911. Such an unpublished decision is eligible for *Chevron* deference when it is "directly controlled by a published decision interpreting the same statute." *Uppal*, 605 F.3d at 714; *see also Garcia-Quintero*, 455 F.3d at 1014 (requiring the published decision "address[] the precise question at issue"); *Marmolejo-Campos*, 558 F.3d at 911 (requiring that the published decision "address[] the dispositive question of statutory interpretation"). Unpublished BIA decisions must satisfy this standard to be accorded *Chevron* deference.

In *Saldivar v. Sessions*, 877 F.3d 812 (9th Cir. 2017), we rejected the Government's argument that we should defer to a rule enunciated in an unpublished BIA decision that relied on *In re Blancas-Lara*, 23 I. & N. Dec. 458 (BIA 2002), a published decision that was not directly on point. *Saldivar*, 877 F.3d at 815 n.3. *Blancas-Lara* decided that a "period of [lawful] residence after [an individual's] admission as a nonimmigrant . . . may be considered in calculating the period of continuous residence for purposes" of cancellation of removal. *Blancas-Lara*, 23 I. & N. Dec. at 459. The petitioner in *Saldivar* had instead been "'waved through inspection' by an officer," *Saldivar*, 877 F.3d at 813. *Blancas-Lara*, we concluded, was a narrow decision that was confined to a holding "that Congress 'intended . . . to include' and did include 'admissions of nonimmigrants' in [the cancellation of removal] provision." *Id.* at 815 n.3 (quoting *Blancas-Lara*, 23 I. & N. Dec. at 459–60).

*Blancas-Lara* "did not address [Saldivar's] situation . . . , in which an alien was lawfully admitted in an unlawful status." *Id.* Thus, we did not defer to the BIA's unpublished decision, even though that decision recited language from a published decision because the unpublished decision applied a different rule than the one announced in the published decision.

Similarly, in *Velazquez-Herrera v. Gonzales*, 466 F.3d 781 (9th Cir. 2006) (per curiam), we declined to defer to an unpublished BIA decision that purportedly relied on *In re Rodriguez-Rodriguez*, 22 I. & N. Dec. 991 (BIA 1999), a published decision. *Velazquez-Herrera*, 466 F.3d at 783. In *Rodriguez-Rodriguez*, the BIA had to decide whether a Texas crime "constitute[d] *sexual abuse of a minor* or a crime of violence" pursuant to the INA. *Rodriguez-Rodriguez*, 22 I. & N. Dec. at 991–92 (emphasis added). Although it was not directly relevant to its holding, the BIA noted in a parenthetical that Black's Law Dictionary "defin[es] *child abuse* as '[a]ny form of cruelty to a child's physical, moral, or mental well-being.'" *Id.* at 996 (emphasis added) (citation omitted). Then, in *Velazquez-Herrera*, the question presented was what constituted "child abuse" pursuant to the INA; the BIA issued an unpublished decision using the definition of "child abuse" cited in *Rodriguez-Rodriguez*. *Velazquez-Herrera*, 466 F.3d at 782. We held that "neither the dictum in *Rodriguez-Rodriguez* nor the definition the BIA adopted in [its unpublished decision] constitutes a statutory interpretation that carries the force of law." *Id.* at 783 (citations and internal quotation marks omitted). The BIA's decision in *Rodriguez-Rodriguez* had not "address[ed] the dispositive question of statutory interpretation" that the BIA decided in its unpublished decision in *Velazquez-Herrera*. *Marmolejo-Campos*, 558 F.3d at 911.

We recognize that using adjudication to interpret a statute is different from using notice-and-comment rulemaking. Notice-and-comment rulemaking results in a single, general document providing an interpretation of a statutory provision. Adjudication, in contrast, utilizes a case-by-case method of statutory interpretation. If an agency were forced to restrict its adjudication to the factual circumstances in that particular case only, it would be difficult for the agency to provide guidance for application of that same statute in future cases. As the Supreme Court has recognized, "[a]djudicated cases may and do, of course, serve as vehicles for the formulation of agency policies, which are applied and announced therein." *N.L.R.B. v. Wyman-Gordon Co.*, 394 U.S. 759, 765 (1969). Those policies announced in adjudications can and will apply to other adjudications with different facts. This is true in the immigration context, where "[i]t is well-established that Congress delegated to the BIA the authority to promulgate rules, on behalf of the Attorney General, that carry the force of law 'through a process of case-by-case adjudication.'" *Garcia-Quintero*, 455 F.3d at 1012 (quoting *INS v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999)).

The D.C. Circuit has stated that "[w]hen an agency [makes legal policy] by adjudication, because it is a policymaking institution unlike a court, its dicta can represent an articulation of its policy, to which it must adhere or adequately explain deviations." *Kidd Commc'ns v. F.C.C.*, 427 F.3d 1, 5 (D.C. Cir. 2005). We agree with the D.C. Circuit that agency "dicta *can* represent an articulation of its policy," *id.* (emphasis added), but it is not always the case that agency dicta *does* represent an articulation of its policy that warrants deference. As Route correctly recognizes, "[a]llowing *all* parts of published decisions issued by the BIA to be eligible for *Chevron* deference

would permit the BIA to insert a broad range of unrelated or unreasoned policy decisions into published opinions for the purpose of making them binding in future unpublished cases."

As with judicial opinions, "[t]he line is not always easy to draw" when deciding whether language in an agency adjudication is a binding rule or unnecessary dictum. *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1173 (9th Cir. 2004). We have noted that for the purposes of our court's opinions, "where a panel confronts an issue germane to the eventual resolution of the case, and resolves it after reasoned consideration in a published opinion, that ruling becomes the law of the circuit, regardless of whether doing so is necessary in some strict logical sense." *Id.* (citation and internal quotation marks omitted).

We apply the same principle to the BIA's published opinions. When the BIA "confronts an issue germane to the eventual resolution of the case, and resolves it after a reasoned consideration in a published" decision, *id.*, resolution of that particular issue is eligible for *Chevron* deference, including when the BIA relies on that reasoning in an unpublished decision. This guidance accords with our decisions in *Saldivar* and *Velazquez-Herrera*. In *Saldivar*, the BIA intended that its interpretation of the cancellation of removal provision be confined to the unique factual circumstances of that case concerning admission as a nonimmigrant. Thus, whether the clock for the cancellation of removal provision applied to someone who was "waved through inspection" and "lawfully admitted in an unlawful status," *Saldivar*, 877 F.3d at 813, 815 n.3, was not "germane to the eventual resolution of the case," *Cetacean Cmty.*, 386 F.3d at 1173. And in *Velazquez-Herrera*, the BIA's earlier notation of how Black's Law Dictionary defined

"child abuse" was neither germane to the BIA's published decision nor reasoned in the sense that the BIA did nothing other than use a mere parenthetical quotation. *See Velazquez-Herrera*, 466 F.3d at 783.

In contrast, when we apply this principle to Route's case, we conclude that the BIA's published decision in *Alyazji* did interpret the phrase "the date of admission" in § 1227(a)(2)(A)(i)(I), even for situations that do not involve an individual's adjustment of status. In *Alyazji*, the BIA set forth a bright-line rule: "the phrase 'the date of admission' refers to the date of the admission by virtue of which the alien was present in the United States when he committed his crime." *Alyazji*, 25 I. & N. Dec. at 406. Although *Alyazji*'s circumstances involved an adjustment of status, the BIA did not limit this interpretation of § 1227(a)(2)(A)(i)(I) to adjustments of status. The BIA could have decided *Alyazji* without giving a general interpretation of § 1227(a)(2)(A)(i)(I) by confining its ruling to situations involving adjustments of status. Instead, the BIA interpreted § 1227(a)(2)(A)(i)(I) for a multitude of situations, presumably to provide guidance to IJs and the BIA in future cases, like this one. As further proof of the general nature of this interpretation, the BIA applied its new interpretation to a hypothetical scenario that did *not* involve an adjustment of status. *See Alyazji*, 25 I. & N. Dec. at 407–08.

Contrary to Route's assertions, the BIA's interpretation was not "made casually and without analysis" or "uttered in passing without due consideration of the alternatives." *United States v. Johnson*, 256 F.3d 895, 915 (9th Cir. 2001). Instead, the BIA in *Alyazji* "confront[ed]" the interpretation of § 1227(a)(2)(A)(i)(I). *Cetacean Cmty.*, 36 F.3d at 1173. That issue was "germane to the eventual resolution of the

case." *Id.* And the BIA "resolve[d that issue] after reasoned consideration in a published opinion." *Id.*

The BIA subsequently adhered to *Alyazji*'s interpretation of § 1227(a)(2)(A)(i)(I) in its unpublished decision in this case, quoting directly from *Alyazji* and applying the interpretation to Route's circumstances. Thus, the BIA's "unpublished decision [is] directly controlled by" *Alyazji*, "a published decision interpreting the same statute." *Uppal*, 605 F.3d at 714. Accordingly, we conclude that *Alyazji*, and its application in the unpublished BIA decision in this case, meet the requirements of *Mead*. *See id.*

## IV. *Chevron* Step One

At step one of the *Chevron* analysis, we ask "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842–43.

We previously interpreted a portion of § 1227(a)(2)(A)(i)(I) in *Shivaraman*. There, the petitioner entered the United States in 1989 on a nonimmigrant visa. *Shivaraman*, 360 F.3d at 1143. In 1997, Shivaraman adjusted his status to LPR, and in 2000, he was convicted of a crime in Hawaiʻi. *Id.* The IJ and BIA both decided that the 1997 adjustment of status was the relevant "admission" for the purposes of § 1227(a)(2)(A)(i)(I). *Id.* at 1144–45.

We reversed the BIA and held "that both the plain words of the statute and the intent of Congress is clear: the 'date of admission' for the purposes of § [1227(a)(2)(A)(i)], is the date of the alien's lawful entry." *Id.* at 1146. Thus, in accordance with the BIA's later ruling in *Alyazji*, we

concluded that an adjustment of status was not an "admission" for the purposes of § 1227(a)(2)(A)(i)(I).  *Id.*

With respect to the phrase "the date of admission," we wrote that "[t]he provision makes it clear that it is '*the* date' of lawful entry after inspection and authorization that triggers the five-year period under the pertinent provision of the statute.  There can be only one 'the' date."  *Id.* at 1148 (citation omitted) (emphasis in original).  Thus, "[w]here the alien legally enters the U.S. after inspection and authorization and remains in a lawful status thereafter, the date of his lawful entry is 'the' date of his admission, as that term is defined in the statute."  *Id.* at 1148–49.  What we did not answer in *Shivaraman*, however, was *which* date constitutes *the* date when an individual has multiple admissions preceding a conviction for a CIMT.

The plain text of § 1227(a)(2)(A)(i)(I) does not answer this question.  The statute makes no attempt to distinguish which admission is the relevant one when there are multiple admissions.  "To maintain the proper separation of powers between Congress and the executive branch, we must 'exhaust all the traditional tools of construction' before we 'wave the ambiguity flag.'"  *Medina Tovar v. Zuchowski*, 982 F.3d 631, 634 (9th Cir. 2020) (quoting *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019)).  For example, "[a] provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme."  *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988).  But even those other tools of statutory construction do not resolve the ambiguity about which date is "the date of admission."  Other provisions of the INA do not specify which admission should govern application of § 1227(a)(2)(A)(i)(I).  The INA provides a definition of "admission," *see* 8 U.S.C. § 1101(a)(13)(A), but that

definition does not provide guidance as to which admission is the pertinent one when there are multiple admissions.[3] Even with our traditional tools of statutory interpretation, we cannot discern clear guidance from Congress as to which date of admission is the relevant one.

Thus, we join the Fourth Circuit in holding that "[t]he INA is silent as to *which* admission should be used in determining an alien's removability under [§ 1227(a)(2)(A)(i)] in the event an alien has multiple admissions." *Sijapati v. Boente*, 848 F.3d 210, 216 (4th Cir. 2017). "[T]he phrase 'the date of admission' is ambiguous." *Id.*; *see also Alyazji*, 25 I. & N. Dec. at 400 ("The statutory language does not specify which of an alien's various admissions should be considered, and thus we find the statute to be ambiguous in that regard."). Having concluded that Congress has not "directly spoken to the precise question at issue," *Chevron*, 467 U.S. at 842, we proceed to the second step of the *Chevron* analysis.

---

[3] We note that we have cautioned against mechanically applying the § 1101(a)(13)(A) definition of "admission" to every provision in the INA. "Although we have said that § 1101(a)(13)(A) provides the primary, controlling definition of 'admitted,' we similarly have embrace[d] an alternative construction of the term when the statutory context so dictates." *Ramirez v. Brown*, 852 F.3d 954, 961 (9th Cir. 2017) (citation and some internal quotation marks omitted) (alteration in original). Specifically, the BIA has held that adjustment of status can constitute an "admission," *Alyazji*, 25 I. & N. Dec. at 399–404, and we have agreed with that conclusion, *see Shivaraman*, 360 F.3d at 1146–47. However, we have declined to adopt a reading that "any event that qualifies as an admission under this definition can serve as the date of admission for the purposes of" § 1227(a)(2)(A)(i). *Id.* (emphases and internal quotation marks omitted).

## V.  *Chevron* **Step Two**

"[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."  *Chevron*, 467 U.S. at 843.  We "need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding."  *Id.* at 843 n.11.  The agency's interpretation of the ambiguous statute is to be "given controlling weight unless [it is] arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 844.  We "may not substitute [our] own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency."  *Id.*  Instead, "[w]e must accept the BIA's construction if it is reasonable."  *Pirir-Boc v. Holder*, 750 F.3d 1077, 1081 (9th Cir. 2014).  Our inquiry for a *Chevron* step two analysis is further guided by the subject matter of this case.  "Judicial deference in the immigration context is of special importance, for executive officials exercise especially sensitive political functions that implicate questions of foreign relations." *Negusie v. Holder*, 555 U.S. 511, 517 (2009) (citation and internal quotation marks omitted).

We hold that the BIA's interpretation of § 1227(a)(2)(A)(i)(I) in *Alyazji* is reasonable.  Faced with an ambiguity about which of multiple admissions would constitute "*the* date of admission," the BIA employed a number of traditional tools of statutory interpretation.  For example, the BIA considered the basic purpose of § 1227(a), which is to remove individuals who are "in and admitted to the United States."  *Alyazji*, 25 I. & N. Dec. at 406 (quoting 8 U.S.C. § 1227(a)).  An individual is "in and admitted to the

United States" when he or she is "present in the United States *pursuant to* an admission." *Id.* From this structure of § 1227(a), the BIA held that the provision "is focused on admission plus presence." *Id.* That conclusion is reasonable in light of Congress's decision to apply the removability grounds in § 1227(a) to those individuals who are "in and admitted to the United States."

Additionally, the BIA considered alternative interpretations of § 1227(a)(2)(A)(i)(I), including one advanced by DHS where "admission would be construed in accordance with [§ 1101(a)(13)(A)] except where vindication of the legislative purpose and the avoidance of absurd results dictates a broader reading." *Id.* at 403. As noted above, the BIA sought to avoid an interpretation that would be "customized to meet each new context," and would "introduce unpredictability and incoherence to the law." *Id.* at 404. The BIA's adoption of a bright-line rule accords with our decision in *Shivaraman*, where we warned that the BIA should not "establish[] a regime where an IJ may pick and choose, without guidance, and at his apparent whim, among several dates of 'admission' for purposes of determining removability under" § 1227(a)(2)(A)(i). *Shivaraman*, 360 F.3d at 1147; *see also id.* (faulting the BIA for creating a rule that "allows for an IJ's exercise of unbounded discretion with disparate effects and drastic immigration consequences").

The BIA also rejected an interpretation that would always focus on the first date of admission, as such an interpretation "is not reconcilable with the language and purpose of the statute and would lead to 'peculiar consequences' when applied to aliens who were briefly admitted many years ago (such as tourists, perhaps) and who remained outside the United States for decades thereafter

before being readmitted." *Alyazji*, 25 I. & N. Dec. at 406 n.6 (quoting *Shanu*, 23 I. & N. Dec. at 761).

Finally, the BIA considered changes to the statutory language, its own precedent, and precedent from United States Courts of Appeals, including our own. *See id.* at 399–406 (citing *Shivaraman*, 360 F.3d 1142). Using such background tools to interpret an ambiguous statute is neither arbitrary nor capricious. It is the very same tools we would employ were we to interpret § 1227(a)(2)(A)(i)(I) on a blank slate. Taken together, the BIA's interpretation is "a permissible construction of the statute." *Chevron*, 467 U.S. at 843.

Route argues that if a nonimmigrant "makes a brief trip outside the United States and returns for the purpose of resuming a lawful period of residence that resulted directly from the first admission, then the five-year clock should not be reset by the subsequent admission." The *Alyazji* interpretation of § 1227(a)(2)(A)(i)(I) does reset the clock each time an individual physically leaves the United States and reenters as a nonimmigrant, even if that trip abroad is very brief. *See Sijapati*, 848 F.3d at 218. "By contrast, the INA allows lawful permanent residents to make brief trips abroad without resetting their date of admission." *Id.* (citing 8 U.S.C. § 1101(a)(13)(C)(ii)). While the *Alyazji* interpretation subjects nonimmigrants to harsher immigration consequences than LPRs, we have previously noted "Congress's well-established policy of affording aliens with legal permanent resident status more benefits than non-permanent residents under the INA." *Cuevas-Gaspar v. Gonzales*, 430 F.3d 1013, 1028 (9th Cir. 2005), *abrogated on other grounds by Holder v. Martinez Gutierrez*, 566 U.S. 583 (2012); *see also Sijapati*, 848 F.3d at 218; *Moore v. Ashcroft*, 251 F.3d 919, 925 (11th Cir.

2001). That the BIA would interpret an ambiguous statutory provision to subject nonimmigrants to the consequences of § 1227(a)(2)(A)(i), even if traveling for only a brief period, accords with that general congressional policy. The BIA's interpretation reflects "a reasonable policy decision" by Congress. *Sijapati*, 848 F.3d at 218.

Route's proposed interpretation of § 1227(a)(2)(A)(i)(I) would focus on an individual's ties to the United States and the length of his or her trip abroad. That interpretation might also be a reasonable one, but we do not compare multiple interpretations to decide which is the fairest. Instead, the focus at step two of the *Chevron* analysis is whether the BIA's interpretation is "a permissible construction of the statute." *Chevron*, 467 U.S. at 843. Based on the analysis in *Alyazji*, interpreting the "the date of admission" language in § 1227(a)(2)(A)(i)(I) to mean "the date of the admission by virtue of which the alien was present in the United States when he committed his crime" is reasonable. *Alyazji*, 25 I. & N. Dec. at 406.

Route also argues that "[t]he BIA failed to properly apply *Alyazji* to [his] case." "[T]he BIA's failure to properly apply" its own binding precedent can "take[ an] unpublished order well beyond the bounds of both *Chevron* and *Skidmore*." *Barrera-Lima v. Sessions*, 901 F.3d 1108, 1117 (9th Cir. 2018). In contrast, when the BIA applies its own precedent reasonably, it can meet the requirements of *Chevron*'s second step. *Cf. Henriquez-Rivas v. Holder*, 707 F.3d 1081, 1089 (9th Cir. 2013).

The BIA's unpublished decision in this case reasonably applied the rule from *Alyazji*. The BIA noted in *Alyazji* that a long-ago admission that is "untethered to [an individual's] presence in the United States when the crime involving moral turpitude was committed" would not be the relevant

date of admission. *Alyazji*, 25 I. & N. Dec. at 406 n.6. To Route, "[t]he logical corollary is that when two admissions are related in purpose and presence in the United States is not abandoned, the first admission is tethered to the second and, thus, the first admission governs the § 1227 analysis."

Route misreads *Alyazji*. The BIA wanted to ensure that the relevant admission is the one that led to the individual's physical presence in the United States when he or she committed the CIMT. A previous admission is "untethered to [an individual's] presence in the United States" when that person subsequently left the country. *See id.* Route did just that. Although Route was admitted in 2005, he subsequently left the country and was again admitted in 2015. Per *Alyazji*, it is the 2005 admission that is "untethered" to Route's presence during which he committed a CIMT. Route's 2015 admission is "the admission by virtue of which [Route] was present in the United States when he committed his crime." *Id.* at 406. As we stated in *Shivaraman*, "[w]here the alien legally enters the U.S. after inspection and authorization and remains in a lawful status thereafter, the date of his lawful entry is 'the' date of his admission, as that term is defined in the statute." 360 F.3d at 1148–49. Route legally entered the United States in 2015 after being inspected. He remained in the lawful status of nonimmigrant thereafter. That date of his lawful entry—2015—is the date of admission.

Additionally, the BIA's application of *Alyazji* here accorded with the hypothetical scenario that the agency gave in *Alyazji* itself, where two admissions resulted in the more recent admission being relevant for § 1227(a)(2)(A)(i)(I) clock. *See Alyazji*, 25 I. & N. Dec. at 407–08. Although the BIA's hypothetical involved two admissions separated by an eight-year absence, the BIA's focus was on which admission allowed the individual to enter the United States and commit

a CIMT. *See id.* The BIA applied the same rule to Route's circumstances, so its application of *Alyazji* to its unpublished decision here was reasonable.

Thus, the BIA, both in its original interpretation of § 1227(a)(2)(A)(i)(I) in *Alyazji* and in its application to Route's case, is to be "given controlling weight" because it is not "arbitrary, capricious, or manifestly contrary to the statute." *Chevron*, 467 U.S. at 844. We defer to the BIA and hold that Route was removable pursuant to § 1227(a)(2)(A)(i).

## VI.  US-FSM COFA

Finally, Route argues that the *Alyazji* interpretation of § 1227(a)(2)(A)(i)(I) "would not provide for 'free association,' because [a] FSM citizen would constantly be subject to a forever renewable period to gauge their moral character regardless of their actual presence in the United States."

Micronesian citizens can enter, reside in, and work in the United States without visa approval or labor certification. *See* US-FSM COFA § 141(a). Even so, a Micronesian citizen's time spent in the United States as a nonimmigrant "does not confer on" that person "the right to establish the residency necessary for naturalization," though the individual can become a LPR or citizen through other paths. *Id.* § 141(h). Additionally, the US-FSM COFA provides that the INA "shall apply to any person admitted or seeking admission to the United States . . . , and nothing in the Compact . . . shall be construed to limit, preclude, or modify the applicability of, with respect to such person . . . any ground of inadmissibility or deportability under" the INA. *Id.* § 141(f)(1). The US-FSM COFA provides specific and

narrow exemptions from the INA for Micronesian citizens. *See id.*

In interpreting the United States' COFA with the Republic of Palau, we held that that COFA "exempts" Palauans "only from . . . specifically enumerated subsections" of the INA "and that it does not provide an exemption" not listed therein. *United States v. Terrence*, 132 F.3d 1291, 1294 (9th Cir. 1997). Pursuant to the doctrine of "'*inclusio unius est exclusio alterius*' (the inclusion of one is the exclusion of the other)," the mention of only specific exemptions means that "the requirements of all other provisions of immigration law remain applicable." *Id.* Route concedes that the text of the US-FSM COFA does not "exempt[ him] from § 1227(a)(2)(A)(i) or any other provision of the immigration laws."

Instead, Route "argues that the COFA helps provide the statutory context and flexibility within which to interpret the phrase 'the date of admission' to comport with congressional intent." Route's contention is that the general spirit of the US-FSM COFA—creating a special relationship between our two nations—should change how the BIA and our court interpret § 1227(a)(2)(A)(i)(I) when applied to Micronesian citizens.

The text of the US-FSM COFA is clear. Micronesian citizens are subject to the removability grounds in § 1227(a). Interpreting that provision differently for Micronesian citizens would create two interpretations of the same statute. As the BIA noted, "[a]s a rule, a single statutory term should be interpreted consistently." *Alyazji*, 25 I. & N. Dec. at 404 (citing *Clark v. Martinez*, 543 U.S. 371, 382 (2005)). The President negotiated, and Congress approved, a comprehensive scheme governing our relationship with the Federated States of Micronesia. That scheme included

application of § 1227(a)(2)(A)(i) to Micronesian citizens who are admitted to the United States as nonimmigrants, *see* US-FSM COFA § 141, the same § 1227(a)(2)(A)(i) that is applied to citizens of other nations. We apply both the INA and US-FSM COFA consistently with the text of those enactments and defer to the BIA's permissible interpretation of the former.

\* \* \*

We acknowledge that the *Alyazji* interpretation of § 1227(a)(2)(A)(i)(I) results in serious consequences when applied to Route. As a Micronesian citizen, Route had less incentive to apply to become a legal permanent resident or naturalize as a United States citizen. Unlike nonimmigrants from some other countries, Route could leave and enter the United States at will without a visa and continue to work in the United States without prior authorization. Route built a life in this country, raising five children who are citizens of the United States. Being removed from the United States, a place Route has called home since 2005, is undoubtedly difficult for Route and his family. However, Route never applied to be a LPR, and he does not enjoy the privileges that accompany that status. *See* 8 U.S.C. § 1101(a)(13)(C).

It is possible that the BIA could have produced a different interpretation of § 1227(a)(2)(A)(i)(I), one that was still permissible pursuant to *Chevron* but more flexible when applied to nonimmigrants like Route. And Congress, of course, could resolve the ambiguity in § 1227(a)(2)(A)(i)(I) by adopting Route's proposal of focusing on an individual's ties to the United States.

But the BIA did not interpret § 1227(a)(2)(A)(i)(I) in such a way, and Congress has not adopted language mirroring Route's proposal. As members of the judicial

branch, we cannot impose a different interpretation by fiat when the Supreme Court instructs us to defer to an agency's reasonable interpretation of ambiguous statutory language. *See Chevron*, 467 U.S. at 843–44. We also cannot augment application of § 1227(a)(2)(A)(i)(I) because a particular petitioner has longstanding ties to the United States. When applying a statute enacted by the legislative branch and interpreted by the executive branch, we sit as a court of law, not of equity. So long as an individual commits a crime that meets the criteria of § 1227(a)(2)(A)(i), that individual is subject to removal. Route was admitted to the United States in 2015 and committed a crime involving moral turpitude in 2018. Consequently, he is removable pursuant to § 1227(a)(2)(A)(i) for having been "convicted of a crime involving moral turpitude committed within five years . . . after the date [his] admission." Therefore, we affirm the BIA and deny the petition for review.

**PETITION DENIED.**